# FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE____ APR 2 5 2013

_____
for CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Apr 25, 2013

Ronald R. Carpenter
Supreme Court Clerk



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of Recall Charges Against City of Pacific Mayor | ) ) ) | No. 88005-1 |
| | | En Banc |
| CY SUN. | ) ) | |
| | ) | Filed _____ APR 2 5 2013 |

C. JOHNSON, J.—The elected official in this recall petition is Mayor Cy Sun of the city of Pacific, a small town located in both King and Pierce Counties. Less than one year after Sun took office, Donald Thomson started this recall petition alleging numerous acts of misfeasance and malfeasance, and violation of the oath of office. The superior court found two charges adequate for submission to the voters, namely, that Sun attempted to use the city police department as his own personal police force and that Sun's actions jeopardized the city's liability insurance coverage. Sun now appeals the superior court order finding these charges sufficient. Also at issue is Thomson's cross appeal asking the court to reinstate several charges that the superior court found insufficient. For the reasons that follow, we affirm the trial court in all respects.

## FACTS AND PROCEDURAL HISTORY

Sun ran as a write-in candidate for mayor. He won the election on November 8, 2011, and took office shortly thereafter. He ran on a platform pledging to rid the city of corruption and patronage, and his term has been a controversial one.

Many of the complaints against Sun evolve out of his allegedly abusive and hostile treatment of city employees, which resulted in multiple vacancies in key city positions and allegedly inhibited the proper functioning of the city's government. Of eight key department head positions, five were vacant when the recall petition was filed. One department head resigned before Sun took office because Sun had repeatedly threatened to fire him during the campaign. Two others resigned, citing Sun's abusive and hostile manner of running the city, and two more were fired, one after she had filed a whistleblower complaint. The record also contains allegations that Sun signed off on building permits without the qualifications or authority to do so and destroyed numerous public documents. Police investigated the destruction of public documents, and Sun attempted to enter the crime scene and was arrested. He tried to fire the arresting officers. During the *Loudermill*[1] hearings required for these police officers as well as other terminated

---

[1] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

city employees, Sun allegedly abused the process and repeatedly refused to let employees present their cases.

On August 23, 2012, Thomson filed the statement of charges against Sun with the King County Elections Division. The King County prosecutor filed a petition on September 6, 2012, to determine the sufficiency of the charges. Of the numerous charges levied against Sun, the superior court found only two adequate for submission to the voters:

> [Whether] Mayor Sun committed misfeasance in office, malfeasance in office and/or violated his oath of office by:
> (1)  Directing Pacific police department officers to operate as his personal police force in conducting a criminal investigation into the identity of those responsible for distributing negative information and allegations about him concerning his Echo, Oregon property, which is outside of their jurisdiction; [and]
> (2)  Jeopardizing the City's liability insurance coverage by not filling vacant department heads.

Clerk's Papers (CP) at 416.

Sun timely appealed this decision, arguing that these charges were neither factually nor legally sufficient to support a recall charge. Thomson sought to cross appeal, which Sun argued was untimely. In February 2013, we decided the timeliness issue, as well as several other procedural motions. We found Thomson's cross appeal to be timely and struck several declarations from both parties because they discussed developments that occurred after the superior court's order, which

are not relevant to our review of the trial court's decision. We now address the substantive merits of both appeals.

ANALYSIS

*a. Standard of Review*

Elected officials in Washington may be recalled for malfeasance, misfeasance, or violation of the oath of office. CONST. art. I, §§ 33-34; RCW 29A.56.110. "Misfeasance" and "malfeasance" are "any wrongful conduct that affects, interrupts, or interferes with the performance of official duty." RCW 29A.56.110(1). Further, "misfeasance" is the "the performance of a duty in an improper manner," and "malfeasance" is the "commission of an unlawful act." RCW 29A.56.110(1)(a), (b). "Violation of the oath of office" is "the neglect or knowing failure . . . to perform faithfully a duty imposed by law." RCW 29A.56.110(2).

Although the court does not evaluate the truthfulness or falsity of the allegations, it stands as a gatekeeper to ensure that elected officials are not subject to recall for frivolous reasons. This requires the court to determine that the recall petitioner "ha[s] knowledge" of the acts complained of, RCW 29A.56.110, and that the allegations are both factually and legally sufficient. Factual sufficiency requires that the petition "give a detailed description including the approximate date,

location, and nature of each act" that, if accepted as true, would constitute a prima facie case of misfeasance, malfeasance, or the violation of the oath of office. RCW 29A.56.110. Legal sufficiency requires that the petition state, with specificity, substantial conduct clearly amounting to misfeasance, malfeasance, or violation of the oath of office. If recall is sought for acts falling within the elected official's discretion, the official must have acted with a manifest abuse of discretion. *In re Recall of Bolt*, No. 88227-4, 2013 WL 1286213 (Wash. Mar. 28, 2012).

### b. Knowledge

Throughout his briefing, Sun challenges Thomson's knowledge of the facts upon which the recall petition is based. We have little case law on the issue of what exactly constitutes sufficient knowledge, though the governing statute specifies "knowledge," not necessarily firsthand knowledge. RCW 29A.56.110. In *West*, we expressed concern that the recall petitioner had simply read in the newspaper about the mayor's alleged quid pro quo offer to a young person, and we refrained from "establish[ing] that media articles, categorically, may form a sufficient basis for the personal knowledge" required. *In re Recall of West*, 155 Wn.2d 659, 666 n.3, 121 P.3d 1190 n.3 (2005). However, we allowed the charge to go forward because the trial court had found that the mayor essentially admitted to the conversations and because the mayor did not contest that finding on appeal.

Although it does not appear that Thomson worked for the city or witnessed any of the alleged misconduct (he appears to be the chair of a committee to recall the mayor), we find that Thomson had sufficient knowledge. The petition contained numerous declarations from individuals who witnessed firsthand the alleged conduct, as well as numerous exhibits in the form of e-mails, letters, and other documents. Moreover, many of these facts were also reported in the media, and Sun bragged of others (i.e., vacant department positions) in his personal newsletter. The petition identifies the people who were involved, and they have submitted sworn documents discussing the alleged facts. This is a sufficient showing of knowledge of the facts to satisfy RCW 29A.56.110.

### c. Counts the Trial Court Found Adequate To Submit to the Voters

Count 1:

> Directing Pacific police department officers to operate as his personal police force in conducting a criminal investigation into the identity of those responsible for distributing negative information and allegations about him concerning his Echo, Oregon property, which is outside of their jurisdiction.

The basis for count 1 takes root with an April 2012 pamphlet entitled, "Who is the Real Cy Sun?" CP at 132. The pamphlet was circulated by an unknown person or persons and drew attention to allegedly false statements by Sun, including that he was a personal physician to Henry Kissinger and President Eisenhower, that he owned a 700 acre ranch in Echo, Oregon, and that he was a

nuclear physicist. Much of the pamphlet relates to the ranch in Oregon, stating that the parcel was only 20 acres with a value of roughly $11,000 and that dead chickens and peacocks were visible on the property. Shortly after the pamphlet was circulated, Sun sent a letter to the acting chief of police demanding an investigation into who created this pamphlet. Thomson argues that the letter demands that police conduct an extrajurisdictional investigation in Oregon and that Sun was trying to use the police department as his own personal police force. Sun counters that the letter simply demands an investigation into the possibility that city resources were used in compiling the pamphlet, which would be a misuse of city resources requiring the mayor to investigate.

Far from inquiring into another person's possible misuse of city resources, Sun himself sought to misuse city resources by demanding that police investigate his opponents' concerns and his own personal concerns. The role of local police is to serve the city, not to investigate the Umatilla County sheriff's department and conduct polygraphs of the mayor's opponents, especially as there appears to be no basis for his suspicion that city resources were used to create the pamphlet. Accordingly, this charge is factually sufficient.

Similarly, this charge is also legally sufficient. As discussed above, Sun's demand was improper and exceeded his authority as mayor. Sun's demand that

police investigate the pamphlet is not only a misuse of city resources, but also an improper interference with the police officers' official duties. This improper interference falls within the definition of misfeasance, malfeasance, or violation of the oath of office. Thus, we affirm the trial court and find this charge factually and legally sufficient.

Count 2:

Jeopardizing the City's liability insurance coverage by not filling vacant department head positions.

Count 2 also relies on a letter as its basis. This letter is from the Cities Insurance Association of Washington (CIAW) and indicates the CIAW's intent to cancel Pacific's insurance coverage on December 31, 2012.[2] The letter states that coverage "will be cancelled" due to "vacancy in several key City staff positions," which "could lead to litigation." CP at 237. The CIAW was also concerned about "other actions that could lead to litigation and appear to have been entirely avoidable." CP at 237. Although it did not rule out reconsidering its decision, the CIAW felt cancellation was necessary to protect itself. The parties do not dispute that at least five of the eight key department head positions were vacant when the

---

[2] The ballot synopsis uses the word "jeopardizing" insurance coverage, and Sun uses this language to argue that some possible, future harm should not be enough to support a recall charge. However, the language of the letter shows that the CIAW had already decided to terminate its coverage.

CIAW sent its letter. Thomson alleges that Sun's wrongful and improper conduct caused these vacancies and increased the likelihood of the city's liability, while Sun counters that the city council was equally if not more at fault in creating the vacancies.

During his campaign, Sun repeatedly threatened to fire one of the department heads, Jay Bennett. Therefore, once Sun was elected, but before he took office, Bennett resigned. Sun fired another department head on February 7, 2012, although the record is not clear as to why. A third department head, Jim Morgan, states in a declaration that in one of his first meetings with the mayor, Sun verbally abused him. This pattern of verbal harassment and aggressiveness continued and, ultimately, the stress forced Morgan to resign. On April 13, 2012, Finance Director Maria Pierce resigned for similar reasons.

Perhaps the most egregious allegations surrounding the vacancies involve Jane Montgomery, the city clerk/personnel manager. Her declaration states that Howard Erickson, who was not a city employee, came to the city hall on multiple occasions threatening to get her fired and using defamatory language directed at her. The mayor, apparently a friend of Erickson's, promised to intervene on Montgomery's behalf, but as the situation escalated, Montgomery sought a protective order. In the meantime, however, Sun hired Erickson as a city building

9

official/code enforcement officer, a hiring that violated collective bargaining agreements. Erickson and Sun then allegedly commenced signing off on building permits, despite the fact that neither was qualified to do so.

On June 8, 2012, Montgomery filed a whistleblower complaint regarding these and other incidents. Despite receiving advice from the city attorney that firing Montgomery would be illegal and could be tortious, Sun, that same day or shortly thereafter, told Montgomery that she was terminated. He also had staff members place a padlock on her office door so that she could not enter. In the weeks that followed, it appears that Montgomery attempted to work and Sun attempted to keep her from working, even terminating her e-mail access. Police were repeatedly involved, as were attorneys for Montgomery and the city. Ultimately, Sun terminated Montgomery by letter on July 23, roughly three weeks after the CIAW notified the city of its intent to cancel its insurance coverage. During this time, it also appears a union grievance was filed against Sun for creating a hostile work environment.

These allegations suggest that at the time the CIAW decided to withdraw coverage, not only were there several key vacancies but whistleblower protection statutes were being violated, unqualified personnel were issuing building permits, and union grievances were being filed. All of these factors could increase the

potential liability of the city. If true, the voters could likely also infer that Sun's improper actions caused this situation and that these facts were what caused the CIAW to withdraw coverage. Sun attempts to shift the blame by pointing to the city council's stonewalling as the reason why positions have not been filled, while also pointing out that the CIAW's letter does not blame the mayor as the sole cause. The mayor's focus on causation, however, is misguided as that issue is an inference best resolved by the voters. Thus, we find this charge factually sufficient.

We also find this charge legally sufficient. If we assume the veracity of the allegations, Sun's actions, at the very least, impeded Montgomery's ability to perform her official duties. If he retaliated against her for filing a whistleblower complaint, he likely violated the law[3] and, given the advice he received from the city attorney, Sun knew he was violating the law. Sun argues that these decisions involved the exercise of discretion and that he cannot be recalled for exercising his discretion. Where a recall petition seeks to recall an elected official for a discretionary act, the official must have exercised his or her discretion in a manifestly unreasonable manner. Thomson adequately alleges that Sun unilaterally mistreated employees, refused to follow required procedures, and violated union

---

[3] *See* RCW 42.41.040 (prohibiting retaliatory action against a local government employee who files a whistleblower complaint).

contracts. If the voters believe these allegations to be true, the allegations show that Sun exercised his discretion in a manifestly unreasonable manner.

### d. Counts the Trial Court Dismissed

#### i. Impeding the Proper Functioning of the Government[4]

This count, which the trial court dismissed, is based on many of the same facts as count 2, including creating a hostile work environment and depleting departments of key personnel, as well as additional facts regarding improperly appointing Howard Erickson as building inspector and interfering with another employee's job performance. Thomson also goes into a lengthy discussion of the alleged harassment of Jane Montgomery that ultimately led to her termination and the subsequent lawsuit. These allegations, however, fail to address the crux of this specific recall charge: that the proper functioning of city departments was impeded. Other than conclusory statements that the proper function of the city was impeded, Thomson never provides concrete examples beyond what is already covered by count 2. Absent a separate basis as to how the functioning of the government was impeded, we are left with the same bundle of allegations as in

---

[4] Under this heading, Thomson lumps together several of the charges initially considered by the trial court, including that Sun "created a hostile work environment for employees . . . ; verbally harassed and retaliated against employees; . . . depleted departments of key employees and did not replace them; improperly appointed Howard Erickson as Building Inspector; [and] interfered with Associate Planner Paula Wiech's performance of her duties." Br. of Resp't/Cross-Appellant at 38.

count 2. The voters will have their say as to whether Sun engaged in misfeasance, malfeasance, or violation of the oath of office for these factual allegations. We need not allow the voters two bites at the same apple. Thus, we find this charge redundant as to count 2 and affirm the trial court's dismissal.

ii. Valentine Road Project

These allegations relate to an interlocal agreement between the cities of Pacific and Sumner for road improvements that were to be funded by the Washington State Department of Commerce. In April 2012, both the Department of Commerce and the city of Sumner were concerned that vacancies of key personnel made it impossible for Pacific to continue as the lead entity, and there were concerns about a loss of funding. As a result, Pacific and Sumner entered into a new agreement whereby Sumner took over as the lead agency. This new agreement appears to have resolved the issue.

These allegations also appear factually and legally insufficient. Although the allegations follow a similar argument as count 2, there appears to have been no imminent loss of funding, whereas with count 2 the CIAW actually terminated its coverage. Moreover, it is unclear whether the vacancies upon which Thomson relies are department heads or other city personnel. Further, the issue arose in April, several months before the city's alleged dysfunction reached its peak. Thus,

all of the factual allegations regarding Sun terminating Montgomery, attempting to terminate police officers, and being arrested himself are not relevant to the charge. Because the factual underpinnings of this charge are vague and the issue was apparently resolved by the time the recall petition was filed, this charge is neither factually nor legally sufficient, and we affirm the trial court on this issue.

## CONCLUSION

We affirm the trial court in all respects. Counts 1 and 2 are both factually and legally sufficient. We also affirm the trial court with regard to Thomson's cross appeal, holding that those charges are not factually or legally sufficient.

No. 88005-1

WE CONCUR:

Madsen, C.J.

Stephens, J.

Owens, J.

Wiggins, J.

Fairhurst, J.

González, J.

J.M. Johnson, J.

Gordon McCloud, J.